455 F.3d 18
 UNITED STATES of America, Appellee,
v.
Arsenio RODRÍGUEZ-ORTIZ, Defendant, Appellant.
United States of America, Appellee,
v.
Leonardo Santana-Rodríguez, a/k/a Viejo, Defendant, Appellant.
 No. 05-1350.
 No. 05-1351.
 United States Court of Appeals, First Circuit.
 Heard March 8, 2006.
 Decided July 14, 2006.
 
 COPYRIGHT MATERIAL OMITTED Irma R. Valldejuli, with whom Antonio Moreda Toledo, Victor M. Rivera Gonzalez, and Moreda, Moreda & Rivera Gonzalez, were on brief, for appellant Rodriguez-Ortiz.
 Lorenzo J. Palomares, for appellant Santana-Rodriguez.
 Julie B. Mosley, Assistant United States Attorney, with whom Nelson Perez-Sosa, Senior Appellate Assistant United States Attorney, Jacqueline D. Novas, Assistant United States Attorney, and H.S. Garcia, United States Attorney, were on brief, for appellee.
 Before SELYA, Circuit Judge, HANSEN,* Senior Circuit Judge, and LYNCH, Circuit Judge.
 HANSEN, Senior Circuit Judge.
 
 
 1
 Arsenio Rodriguez-Ortiz (Rodriguez-Ortiz) and Leonardo Santana-Rodriguez (Santana-Rodriguez) were indicted by a grand jury in the District of Puerto Rico on charges of conspiracy to import five kilograms of cocaine and one kilogram of heroin, a violation of 21 U.S.C. §§ 952(a) & 963, and conspiracy to possess with the intent to distribute and distribute at least five kilograms of cocaine and one kilogram of heroin, a violation of 21 U.S.C. §§ 841(a)(1) & 846. On November 8, 2004, after eight days of trial, a jury convicted them on both counts. Both appellants appeal their convictions, challenging the sufficiency of the evidence. Individually, Santana-Rodriguez raises an allegation of juror bias, and Rodriguez-Ortiz challenges the district court's decision to deny him safety-valve relief at sentencing. After careful review, we affirm.
 
 I. FACTS
 
 2
 The facts are presented in a light most favorable to the jury's verdict. United States v. Pinillos-Prieto, 419 F.3d 61, 64 (1st Cir.), cert. denied, ___ U.S. ___, 126 S.Ct. 817, 163 L.Ed.2d 643 (2005). The Government began investigating an alleged drug operation in Puerto Rico in October 2001. Undercover Drug Enforcement Administration (DEA) Special Agent Angel Castro-Lugo (Castro-Lugo) arranged a meeting with a person named Baez-Baez (Baez). Agent Castro-Lugo had received a tip that Baez was selling large amounts of cocaine in the Las Piedras, Puerto Rico area. During Agent Castro-Lugo's meeting with Baez, Baez called someone named "Mister" who would supply Agent Castro-Lugo with the cocaine he was attempting to purchase. "Mister" was later determined to be Marcial Peguero-Mercedes (Peguero), the leader of the drug ring. As the meeting ended, Baez and Agent Castro-Lugo exchanged phone numbers.
 
 
 3
 After the meeting, the DEA obtained court orders for pen registers and wiretaps for Baez's phone number and a number of other telephone numbers used by the drug ring. Agents then determined that the telephone number Baez had called during the meeting with Agent Castro-Lugo was registered to the defendant, Santana-Rodriguez.
 
 
 4
 While the DEA investigation continued, Santana-Rodriguez, an immigrant from the Dominican Republic, was asked by the Immigration and Naturalization Service (INS) to update his immigration file. In doing so, Santana-Rodriguez provided a business address, which was for a kiosk at the Luquillo beach area, as well as a telephone number. Several months later, Agent Castro-Lugo noticed a "for sale" sign on Kiosk No. 20 at Luquillo and recognized the phone number on the sign. The kiosk was the one that Santana-Rodriguez had listed with the INS as his business address. Agent Castro-Lugo, again acting undercover, set up a meeting with Santana-Rodriguez to discuss purchasing the kiosk. In the conversation with Santana-Rodriguez, Castro-Lugo told him that he wanted to use the kiosk to store drug shipments. Santana-Rodriguez told Castro-Lugo that he could introduce Castro-Lugo to someone who could help him out with that kind of business. Santana-Rodriguez also asked what he could get for helping the agent do so. Through Santana-Rodriguez, Castro-Lugo obtained the phone number for the ringleader, Peguero, and a meeting was arranged for November 15, 2002, at Santana-Rodriguez's kiosk.
 
 
 5
 The DEA listened to over 3,400 telephone conversations obtained through the wiretaps, and based upon those intercepts, agents conducted surveillance, and on April 23, 2003, successfully interdicted a shipment of ten kilograms of cocaine and three kilograms of heroin. This shipment had been arranged by Peguero and his associates and was intercepted mid-stream by the authorities.
 
 
 6
 The evidence at trial showed that Santana-Rodriguez often obtained cellular phones and communications devices for the other coconspirators to use. When he became aware that a particular cell phone number had been compromised, Santana-Rodriguez would replace it with a new phone and number. The cell phone used by Peguero to arrange the April 23, 2003, interdicted shipment was listed as having Santana-Rodriguez as the subscriber, and the day after the shipment was seized, Santana-Rodriguez told Peguero he should no longer use that phone.
 
 
 7
 Santana-Rodriguez also arranged for the November 15, 2002, meeting between Agent Castro-Lugo and Peguero, thinking that Agent Castro-Lugo intended to discuss drug smuggling and storage with Peguero and that Agent Castro-Lugo was interested in using Santana-Rodriguez's kiosk for that purpose.
 
 
 8
 Rodriguez-Ortiz was considered to be Peguero's muscle man. DEA agents testified that they observed Rodriguez-Ortiz on two different occasions. The first was at the November 15, 2002, meeting between Castro-Lugo and Peguero at Kiosk 20. Rodriguez-Ortiz and another individual arrived at the meeting separately and conducted counter-surveillance. Rodriguez-Ortiz was later located inside the kiosk, playing pool and watching Peguero and Agent Castro-Lugo during the meeting. Later Rodriguez-Ortiz was observed near the van Agent Castro-Lugo drove to the meeting, writing down the license plate number of the vehicle.
 
 
 9
 Through the telephone surveillance of the coconspirators, DEA agents learned of a money drop-off planned to take place on March 15, 2003, and involving Peguero, Rodriguez-Ortiz, and a woman named Elsa. At the appointed time, Rodriguez-Ortiz was observed as a passenger in the front seat of the minivan driven to the arranged drop-off location. When the van arrived at the prearranged location, a Texaco station located across the street from the Puerto Rico Police Department headquarters, agents observed a woman approach the driver's side of the minivan and, consistent with the intercepted information, be passed a shopping bag. The van drove off and the woman left in a separate vehicle. The jury was free to determine, based on the contents of the intercepted conversation arranging the drop-off, that Peguero was the van's driver and that the shopping bag contained the money.
 
 
 10
 The next day Rodriguez-Ortiz traveled to the Dominican Republic, smuggling in $20,000 for Peguero. He called Peguero afterwards, bragging to him of his success. When Rodriguez-Ortiz was arrested, approximately $6,000, rolled up into three bundles and wrapped in aluminum foil, was seized from his home.
 
 
 11
 The surveillance and drug shipment interception led to the indictment of Santana-Rodriguez, Rodriguez-Ortiz, and four others. The other four were Peguero and Raul Perez-Nunez, who both fled and remain fugitives, and Wilson Reyes-Moreno and Mercedes Figueroa, who both pleaded guilty prior to trial.
 
 II. Analysis
 A. Sufficiency of the Evidence
 
 12
 We first address each defendant's challenge to the sufficiency of the evidence to support the conspiracy convictions. "We review de novo, inquiring whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Washington, 434 F.3d 7, 15 (1st Cir.2006) (internal citations and marks omitted). "All reasonable evidentiary inferences are to be drawn in harmony with the [jury's] verdict, and all issues of credibility are to be resolved in the light most favorable to the government." Id. (internal marks omitted).
 
 
 13
 To succeed at trial, the Government had to convince the jury beyond a reasonable doubt that: (1) a conspiracy existed, (2) the defendants had knowledge of the conspiracy, and (3) the defendants voluntarily participated in the conspiracy. United States v. Lizardo, 445 F.3d 73, 81 (1st Cir.2006). Evidence to prove these elements need not be direct, but can be circumstantial. See id. To support a conviction for conspiracy "each coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." United States v. Martinez-Medina, 279 F.3d 105, 113 (1st Cir.), cert. denied, 536 U.S. 932, 122 S.Ct. 2608, 153 L.Ed.2d 794 and 537 U.S. 921, 123 S.Ct. 311, 154 L.Ed.2d 210 (2002).
 
 
 14
 We are satisfied that the evidence was sufficient to support both of the conspiracy convictions against Santana-Rodriguez. The evidence included the recorded telephone conversations, Santana-Rodriguez's procurement of cellular telephones for use in the conspiracy, the fact that Santana-Rodriguez, knowing its illegal purpose, arranged the meeting between Agent Castro-Lugo and Peguero (which took place at Santana-Rodriguez's kiosk), as well as the testimony of the two DEA agents describing the factual events which occurred. Looking at all of the evidence, the jury could reasonably conclude that Santana-Rodriguez was aware of the drug conspiracy and chose to participate in it voluntarily. While Santana-Rodriguez offered contradictory testimony and advanced alternative reasons as to why his name may have been associated with some of the cell phones, such as testimony that Santana-Rodriguez was the victim of identity theft, it is "the jury's duty ... to assess credibility, and it may accept or reject, in whole or in part, any testimony." United States v. Nishnianidze, 342 F.3d 6, 14 (1st Cir.2003), cert. denied, 540 U.S. 1132, 124 S.Ct. 1107, 157 L.Ed.2d 936 (2004). Taken in the light most favorable to the verdict, the evidence of Santana-Rodriguez's participation in the drug ring was more than sufficient to support his conspiracy convictions.
 
 
 15
 With respect to Rodriguez-Ortiz's sufficiency of the evidence argument, we well recognize that mere presence at the scene of conspiracy activities or simple association with conspirators is not enough, standing alone, to establish participation in a conspiracy. United States v. Perez-Gonzalez, 445 F.3d 39, 49 (1st Cir. 2006). However, the Government's evidence was sufficient for a jury to find reasonably that Rodriguez-Ortiz was more than a mere bystander who found himself in the presence of drug conspirators and in the middle of two drug distribution conspiracies. The evidence showed that he transported money to the Dominican Republic and that he called the ringleader, Peguero, informing him of it, and that he provided counter-surveillance and protection for Peguero at the kiosk meeting. Together with the bundled money that was recovered from Rodriguez-Ortiz's residence, a jury could reasonably have found beyond a reasonable doubt that Rodriguez-Ortiz was an active participant in the conspiracies, acting as a bodyguard and money runner for the leader.
 
 
 16
 Accordingly, we reject the sufficiency of the evidence challenges to the convictions of both Santana-Rodriguez and Rodriguez-Ortiz on each count.
 
 B. Juror Bias
 
 17
 Santana-Rodriguez alleges that the district court erred in not dismissing Juror Number Nine or in not declaring a mistrial after allegations of juror bias were raised. A district court has wide discretion in deciding how to handle and how to respond to allegations of juror bias and misconduct that arise during a trial, and we review the district court's decision under a deferential abuse of discretion standard. United States v. Mikutowicz, 365 F.3d 65, 74 (1st Cir.2004).
 
 
 18
 Juror Nine sent at least two notes to the trial judge during the trial. Santana-Rodriguez alleges that the fact that other jurors saw him write these notes, even though they were not aware of the notes' contents, was prejudicial. In addition, Santana-Rodriguez asserts that the district court should have dismissed Juror Nine for bias.
 
 
 19
 In the first note, Juror Nine told the district court he was concerned that he might be acquainted with someone whose name had been mentioned in a recording played at trial. The trial judge, counsel for both appellants, and Government counsel met with the juror, and it was determined that Juror Nine was not acquainted with the person whose name was involved in the present case. No objections or motions were made, and the trial resumed.
 
 
 20
 The second note sent by Juror Nine stated that he had received a death threat regarding his work on the case. An anonymous message had been left with the juror's wife that he should not go to court again or he would be killed. The juror and counsel for all parties met with the trial judge to discuss the threat. Upon examination by the judge, the juror assured the court that he had not told any other juror of the threat and that the threat in no way affected his view of the evidence or made him biased against the defendants. The court also noted that the juror's calm and collected demeanor supported and was consistent with his statements. The juror did not ask to be excused but had notified the district court, and properly so, of the threat in order to make it aware of the situation. After admonishing the juror not to speak of the threat to any other juror, the district court overruled the defense motions to dismiss Juror Nine, finding that there was no basis for dismissal, and the trial continued.
 
 
 21
 We find no abuse of the court's discretion in its decision not to dismiss Juror Nine. The court immediately addressed the situation, the juror assured the court that he was not biased, the juror appeared calm and collected, and no other member of the jury was made aware of the threat. Because the other jurors were unaware of the content of the note to the court, the risk of prejudice was nil. Based on the record before us, the district court did not abuse its discretion.
 
 
 22
 Santana-Rodriguez's allegation that the district court failed to investigate an instance of alleged misconduct by Juror Nine for supposedly driving by Santana-Rodriguez's home also lacks merit. If a claim of juror misconduct is raised, the court must first determine if it is a colorable allegation. Id. If the claim is colorable, then further investigation by the court is warranted in order to determine any possible juror taint or prejudice. Id. "However, misconduct allegations that `are frivolous ... do not trigger any duty of inquiry and do not require that a hearing be held.'" Id. (quoting Neron v. Tierney, 841 F.2d 1197, 1202 n. 6 (1st Cir.1988)). The district court's determination that this claim of misconduct was too weak to warrant even an investigation was not an abuse of discretion. The only evidence presented was a representation by counsel that Santana-Rodriguez's wife had stated that she had seen a van with dark-tinted windows with a juror in it, allegedly Juror Nine, driving by in front of Santana-Rodriguez's house. Santana-Rodriguez provided no sworn affidavits or other accompanying materials; only a bare allegation by counsel was presented to the district court, with no other information to support it, not even a sworn statement from the defendant's wife. The district court's order noted that Santana-Rodriguez had failed "to provide any comprehensible basis for why he believe[d] that this vehicle even contained a juror." "The burden of showing a colorable claim rests with the party raising the issue." Mikutowicz, 365 F.3d at 75. Because Santana-Rodriguez has not met this burden, we find no abuse of discretion in the trial court's decision to deny the motions for mistrial and to dismiss Juror Nine.
 
 C. Safety-Valve Relief
 
 23
 Rodriguez-Ortiz makes a separate claim that the district court erred in finding him ineligible for a safety-valve reduction in his sentence. We review the district court's factual determination for clear error, and "[u]nder that standard, `an appellate court ought not to disturb either findings of fact or conclusions drawn therefrom unless the whole of the record compels a strong, unyielding belief that a mistake has been made.'" United States v. Bermúdez, 407 F.3d 536, 542 (1st Cir.) (quoting United States v. Matos, 328 F.3d 34, 40 (1st Cir.2003)), cert. denied, ___ U.S. ___, 126 S.Ct. 304, 163 L.Ed.2d 264 (2005). "The `safety valve' provision serves to reduce a sentence below the statutory mandatory minimum sentence, and thus the burden of proof rests with [Rodriguez-Ortiz] to establish the five criteria set out in subsection 3553(f)."[1] United States v. Morrisette, 429 F.3d 318, 324 (1st Cir.2005). Only the district court's determination as to Rodriguez-Ortiz's compliance with the fifth factor is at issue here.
 
 
 24
 This court has held that when it comes to the fifth factor, "nothing short of truthful and complete disclosure will suffice." Matos, 328 F.3d at 38. At sentencing, the district court heard from both Rodriguez-Ortiz and Agent Castro-Lugo, the agent Rodriguez-Ortiz spoke with in his debriefing session. Rodriguez-Ortiz continued to deny that he was at either the kiosk or the money drop-off and denied that he had hidden money from the Dominican authorities. Aside from simply denying the charges against him, Rodriguez-Ortiz additionally failed to provide any information to the Government about the drug operation. It is Rodriguez-Ortiz's burden to show that safety-valve relief is warranted, and he must show that he made every effort to provide all the information that he was aware of to the authorities. The district court credited Agent Castro-Lugo's testimony over that of Rodriguez-Ortiz's based on Rodriguez-Ortiz's continued denials, which were contradicted by some of the recorded phone calls and other evidence. Because we find no error, we affirm the district court's determination that Rodriguez-Ortiz was not eligible for safety-valve relief.
 
 III. Conclusion
 
 25
 Accordingly, we affirm the judgment of the district court as to each defendant.
 
 
 26
 
 Affirmed.
 
 
 
 
 Notes:
 
 
 *
 Of the Eighth Circuit, sitting by designation
 
 
 [1]
 The five requirements set forth in 18 U.S.C. § 3553(f), and in the United States Sentencing Guidelines Manual, § 5C1.2, include: 1) the defendant can have no more than one criminal history point, 2) the defendant did not use violence or credible threats of violence nor possess a firearm or dangerous weapon in carrying out the offense, 3) the offense did not result in the death or serious bodily injury of another, 4) the defendant was not an organizer, manager, supervisor or leader, and 5) no later than the time of sentencing, the defendant must "truthfully provide[] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan," but it will not preclude a finding of compliance if the defendant cannot provide new or relevant information to the Government or the Government is already aware of the information the defendant possesses. 18 U.S.C. § 3553(f)(1)-(5)